UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

James C. Coughlin and
Telco Access Partners, LLC,

*Plaintiffs*,

v.

William C. Crump,
Hybri-Tel Communications, LLC, and
Tri-C Endeavors, LLC,

*Defendants*.

Civil Action No.: _____

## **COMPLAINT**

Plaintiffs James C. Coughlin and Telco Access Partners, LLC ("Access Partners"), as and for their Complaint against Defendants William C. Crump, Hybri-Tel Communications, LLC ("Hybri-Tel"), and Tri-C Endeavors, LLC ("Tri-C"), allege as follows:

## **INTRODUCTION**

1.    Plaintiffs James Coughlin and Access Partners bring this action to remedy the brazen and unlawful conduct of Defendant William Crump, a Member and former Member-Manager of Access Partners.  Before and after his resignation as a Member-Manager, Crump was and is actively competing against Access Partners.  He has solicited Access Partners' clients, employee, vendors, and contractors.  He has knowingly and willfully infringed on Access Partners' federally protected trademark.  He has willfully misappropriated the confidential and proprietary information of Access Partners for the unlawful purpose of launching a new, directly competitive venture under the business names of Hybri-Tel and/or Tri-C.

2.    Crump's unlawful actions violate numerous provisions of the Access Partners Operating Agreement, federal trademark law, and his fiduciary obligations to Coughlin and Access

Partners under Massachusetts law.  Additionally, Crump, Hybri-Tel, and Tri-C have engaged in unfair and deceptive business practices, in violation of M.G.L. c. 93A, § 11, by stealing Access Partners' clients, employee, and confidential and proprietary documents, by infringing on Access Partners' federally protected trademark, and by using all of those resources and materials to compete against Access Partners.  These actions also amount to conversion and tortious interference, and have resulted in the unjust enrichment of Crump, Hybri-Tel, and Tri-C at the expense of Coughlin and Access Partners.

## THE PARTIES

3.      Plaintiff James C. Coughlin ("Coughlin") is an individual residing in Medfield, Massachusetts.

4.      Plaintiff Telco Access Partners, LLC ("Access Partners") is a limited liability company organized under the laws of the Commonwealth of Massachusetts.  Access Partners' principal place of business is located in Medfield, Massachusetts.

5.      Coughlin and Crump are Members of Access Partners.  Coughlin is a Member-Manager of Access Partners.  Crump was a Member-Manager of Access Partners until he resigned on or about September 2021.

6.      Defendant William C. Crump ("Crump") is an individual residing in Sarasota, Florida.  From at least 1997 until approximately 2016, Crump was a resident of the Commonwealth of Massachusetts.

7.      Defendant Hybri-Tel Communications, LLC ("Hybri-Tel") is or was a domestic limited liability company organized under the laws of the Commonwealth of Massachusetts.

8.      Defendant Tri-C Endeavors, LLC ("Tri-C") is a limited liability company organized under the laws of the State of Florida.  Tri-C's principal address is 13611 Heritage Way, Sarasota, Florida.  Tri-C was originally organized as a limited liability company under the laws of

the Commonwealth of Massachusetts from April 1997 until December 2016, when a certificate of cancellation was filed with the Secretary of the Commonwealth.

9.      Defendants Hybri-Tel and Tri-C conduct and transact business in substantially the same jurisdictions as Access Partners, including but not limited to Massachusetts.

## JURISDICTION AND VENUE

10.      This Court has subject matter jurisdiction under 28 U.S.C. § 1331, as Plaintiffs' claims include violations of the Lanham Act, which arises under the laws of the United States. Supplemental jurisdiction over the remaining state law claims is proper under 28 U.S.C. § 1367.

11.      This Court has personal jurisdiction over Defendants Crump, Hybri-Tel, and Tri-C under Massachusetts' Long Arm Statute, M.G.L. c. 223A, § 3, which provides for jurisdiction over persons "transacting any business" in the Commonwealth and over persons "causing tortious injury" in the Commonwealth by an act or omission outside the Commonwealth if such persons regularly do or solicit business in the Commonwealth.

12.      Personal jurisdiction over Defendants Crump, Hybri-Tel, and Tri-C is also proper, and comports with due process.  Each Defendant has sufficient minimum contacts with the forum and this suit arises from or relates to Defendants contacts with the forum.

13.      Defendant Crump has consented to personal jurisdiction in Massachusetts because the Operating Agreement provides for specific enforcement in Massachusetts.

14.      Defendants Hybri-Tel and Tri-C are subject to general personal jurisdiction in Massachusetts because, during the relevant time frame, they are or were limited liability companies organized under the laws of the Commonwealth of Massachusetts.

## FACTUAL BACKGROUND

15.      For years, Coughlin and Crump cooperatively partnered to grow Access Partners into a small and successful telecommunications consulting operation, from which they both

derived substantial profits. Coughlin was the Company's founder and sole owner. About a year and a half after the Company was formed, Crump was invited to join Access Partners and lead the Company's day-to-day operations. Thereafter, Crump was invited to become a minority owner. Crump made no capital contributions in exchange for this ownership stake.

16.     At all relevant times, Coughlin was the majority owner of Access Partners. Over time, Coughlin increasingly shared the Company's successes with Crump, in recognition of Crump's work handling day-to-day business operations. Crump's membership stake and compensation were generously increased (all without Crump's contribution of capital into the Company) to the point that, in recent years, Coughlin and Crump agreed to share in distributions equally.

17.     After years of success and growth, Crump decided to ditch his decades-long business partner, and set into motion a scheme of numerous unlawful actions designed to seize total control of the Company's business by any means necessary. First, Crump began allocating cash distributions and taxable income unequally—for his own benefit and to the detriment of Coughlin. This misconduct was intentional. After he got caught, Crump tried to strong-arm Coughlin into a sale of Coughlin's stake in the Company at an unjustifiably low price. When Coughlin refused, Crump took his scheme even further: Crump resigned as a Member-Manager and ***admittedly*** began competing against Access Partners through a new venture, soliciting Access Partners' clients, employee, and vendors, infringing on Access Partners' protected trademark, and misappropriating Access Partners' confidential information and other resources. All of this misconduct was intentional, willful, and a knowing violation of Massachusetts law. Worse yet, Crump's unlawful conduct persists to this day.

***Access Partners***

18.     Access Partners is a Massachusetts member-managed limited liability company, originally founded in 1997.   Access Partners provides consulting services in the telecommunications and real estate sectors.  Access Partners operates at the intersection of those two industries to help clients identify and deliver opportunities for network expansion and to provide network optimization services to telecommunications companies.

19.     Access Partners operates across the United States, with a focus on states along the eastern seaboard including Massachusetts, New York, New Jersey, Pennsylvania, Maryland, and Florida, as well as other jurisdictions such as California and Colorado.

20.     From approximately January 1, 2000 until Crump abruptly gave Coughlin notice of his resignation in September 2021, Access Partners' two Member-Managers were Coughlin and Crump.

21.     In the Company's early years, Coughlin was an 80% owner and Crump was a 20% minority owner.  Crump handled the Company's day-to-day operations.  Coughlin focused on his other business interests, while maintaining his role with Access Partners.

22.     In 2002, Coughlin agreed to increase Crump's ownership stake from 20% to 35%. In addition, Coughlin agreed to share in profits and losses with Crump on a 50/50 basis.

23.     Coughlin was an owner and Member-Manager of Access Partners at all relevant times.

24.     Coughlin remains an owner and Member-Manager of Access Partners today.

***The Access Partners Operating Agreement***

25.     Access Partners is governed by an Operating Agreement, which sets out the rights and responsibilities of Coughlin and Crump in their capacities as Members and as Member-Managers.

26.     Article VI of the Operating Agreement sets out the "Rights and Duties of Members." The Operating Agreement prohibits Members from competing directly against Access Partners, and requires that the proceeds of competitive activity must be held in trust for the benefit of the Company. Specifically, the Operating Agreement's "Conflicts of Interest" provisions provide that:

> 5.1. Subject to the restrictions of the second and third sentences of this Article VI, §5.1, a Member (regardless of whether such Member is a Member-Manager) shall be entitled to enter into transactions that may be considered to be competitive with, or a business opportunity that may be beneficial to, the Company, it being expressly understood that some of the Members may enter into transactions that are similar to the transactions into which the Company may enter. Notwithstanding the foregoing, Members shall account to the Company and hold as trustee for it any property, profit, or benefit derived by the Member, without the consent of a Majority of the Remaining Member-Managers, or, if none, a Majority of the Remaining Members, in the conduct and winding up of the Company business or from a use or appropriation by the Member of Company Property or property (including information) developed after the date hereof exclusively for the Company or from opportunities expressly offered to the Company which the Company has not declined in writing. Further, without the consent of a Majority of the Remaining Member-Managers, or, if none, a Majority of the Remaining Members, no Member shall divert from the Company any business opportunities of which such Member has actual knowledge that materially relate to the services or products provided by the Company.

27.     Additionally, the Operating Agreement contains strict confidentiality terms that require, absent exceptions not relevant here, the protection of Access Partners' confidential business information:

> 5.3. **Confidentiality**. Each of the Company and the Members agree that each will hold in strict confidence, and not use except for Company purposes in accordance with this Company Agreement, all technical, commercial and other proprietary information of the Company and all information relating to the businesses or operations of the other parties hereto, including in each case without limitation information contained in or consisting of databases, methodologies including any said information received in connection with the formation of the Company or at any time during the term of this Company Agreement, and that it will not divulge such information to any Person without the written permission of the other parties . . .

28.     Article VII of the Operating Agreement governs the rights and duties of Managers. It provides that "all decisions concerning the affairs of the Company shall be made by unanimous agreement of the Managers, who shall be Member-Managers."   Under Article VII, Section 3 "[o]nly the Member-Managers, acting jointly, shall have the authority to bind the Company."

29.     Article VII, Section 3 also states that "each Member shall indemnify the Company for any costs or damages incurred by the Company as a result of the unauthorized action of such Member."  Additionally, "[e]ach Member-Manager shall indemnify the Company for any costs or damages incurred by the Company as a result of that Member-Manager unilaterally taking any of the actions specified in Article VII, § 3 below without the consent of the other Member-Managers." Article VII, Section 3 specifies a number of actions requiring unanimous consent, including:  the "payment of compensation or additional compensation to any or all Members . . ." and the "execution of documents on behalf of the Company . . . ."

30.     Article VII also governs the duration of any Member's service as a Member-Manager.  Member-Managers shall serve until the earliest of either their "Dissociation" or their "Resignation."   As defined in the Operating Agreement, "Dissociation" provides the limited circumstances under which a Member may cease their relationship with the Company altogether, including by resigning as a Member.  By contrast, "Resignation" means the "act of a Member-Manager by which such Member voluntarily ceases to be a Member-Manager but continues to be a Member."  A Member-Manager who merely resigns as a Member-Manager continues to retain their equity in the Company as a Member.

31.     Additionally, the contractual duties that Member-Managers owe to one another are described in Article VII, Section 5, which states that:

> The Member-Managers' duty of care and the discharge of the Member-Managers'
> duties to the Company and the other Members is limited to refraining from

engaging in intentional misconduct, fraudulent conduct, embezzlement, or a knowing violation of law.

32.     The Operating Agreement also contains limitations of liability, which provide that liability for loss or damage may be limited if the Member-Manager "acted in good faith and in a manner the Member-Manager(s) reasonably believed to be duly authorized in accordance with this Agreement and in or not opposed to the best interests of the Company . . . ." However, the Member-Manager's "good faith" does not limit liability for loss or damage caused by, among other things, intentional misconduct or knowing violations of law.

33.     Article X of the Operating Agreement establishes additional duties for the Member-Manager who serves as "Tax Matters Partner."

34.     At all relevant times until April 12, 2022, Crump was designated as "Tax Matters Partner."

35.     As Tax Matters Partner, Crump was prohibited from taking any tax action under Code sections 6222-6232 of the Internal Revenue Code without the consent of the Member-Managers.

36.     Effective as of April 12, 2022, following Crump's resignation as Member-Manager, Coughlin was designated as Tax Matters Partner.

37.     Additionally, Article XIV of the Operating Agreement sets out limited circumstances in which the Company shall be dissolved and its affairs wound up, including: "the resignation of a Member with the result that, upon the effective date of such resignation, only one Member of the Company would remain, unless a Substitute Member is elected or appointed prior to such effective date."

38.     The resignation of a Member-Manager, who remains as a Member, is not one of the narrowly defined circumstances triggering dissolution under the Operating Agreement.

39.     Under Article XVI, Section 10, the Operating Agreement is subject to specific enforcement "within the jurisdiction of the state in which the Principal Office of the Company" is located, which is Massachusetts.  And under Article XVI, Section 6, the Operating Agreement is governed by Massachusetts law.

### *Coughlin and Crump Shared in Access Partners' Financial Success*

40.     For nearly two decades, Access Partners was a small, successful, and profitable operation.

41.     Over that time, Access Partners' gross revenues grew to routinely exceed $1 million annually, with substantial profit margins.

42.     Crump was well-compensated for his efforts leading Access Partners' operations. Both Crump and Coughlin received pro-rata distributions of Access Partners' profits, which generally exceeded $100,000 per year per Member.

43.     Beginning in 2006, Access Partners entered into a "Guaranteed Payment Agreement" with Crump, which provided that Crump would be paid a guaranteed amount of $102,060.00 annually.  The purpose of the Guaranteed Payment was to offset incurred operational expenses not otherwise reimbursed by the Company, and for Crump's performance of operational duties as the Company's "Executive Vice President and Chief Operating Officer."

44.     Additionally, in recent years, Crump established for himself a performance-based bonus compensation system work operating the Company, which generally ranged between $2,000 and $3,000 per month (totaling $24,000 to $36,000 per year).

45.     On top of distributions and bonuses, Crump also received a generous benefits package, including health insurance, long term disability insurance, a company credit card for business expenses, reimbursement of his cell phone and internet expenses, a home office stipend, and Company contributions to a 401k.

### *Coughlin and Crump's Agreement on Other Business Ventures*

46.     Over the years, both Coughlin and Crump engaged in various other business ventures, separate and apart from Access Partners.  However, none of these other interests was competitive with Access Partners' business.  This was explicitly agreed to between Coughlin and Crump.

47.     For example, Crump sought to pursue certain business opportunities involving telco hotels (also known as "carrier hotels"), which are telecommunications hubs shared among multiple carriers.  Before engaging in this opportunity, Crump sought out Coughlin's consent, as required under Article VI, Section 5.1 of the Operating Agreement.

48.     In seeking out Coughlin's consent, Crump represented that Access Partners did not service telco hotels (or "carrier hotels"), and therefore, in Crump's view, the activity was not directly competitive.

49.     Coughlin provided written consent to Crump to pursue the telco hotel opportunity, on the basis of Crump's representation that such activity was not directly competitive with Access Partners.

### *Crump's Scheme Began with Unequal and Unauthorized Distributions*

50.     Beginning in or around 2017, Crump started withdrawing funds from the Company—without Coughlin's consent—which were not pro rata and which were not authorized.

51.     For example, in 2019, Crump received $215,599 in distributions, while Coughlin received only $52,248.

52.     The next year, in 2020, Crump received $175,454 in distributions, while Coughlin received only $57,850.

53.     Upon information and belief, the amount of distributions that Crump illicitly siphoned out of Access Partners without Coughlin's consent totaled approximately $300,000.

54.     When Coughlin learned that Crump had been taking unauthorized unequal distributions out of the Company, he confronted Crump and informed him this activity must cease immediately.

55.     Crump acknowledged these disparities, and agreed to rectify it in future years.

56.     To date, Crump has yet to fully account for, or repay, these ill-gotten gains.

### To Further Enrich Himself, Crump Misallocated Taxable Income to Coughlin

57.     In recent years, Crump misallocated the Company's taxable income between Access Partners' Members in order to force Coughlin to shoulder a disproportionate share of the Members' aggregate tax burden.

58.     At all relevant times, Coughlin held a 65% interest in Access Partners and Crump held a 35% interest in Access Partners. However, Coughlin and Crump each held a 50% interest in the profits of Access Partners.

59.     For example, on the Company's 2019 tax return, Crump allocated to Coughlin a full 50% share of the Company's taxable income, while Coughlin had received less than 20% of cash distributions.

60.     Indeed, for the period 2017 through 2019, Crump allocated to Coughlin approximately $440,000 of taxable income, yet distributed to Coughlin only $217,275 of cash.

61.     The disproportionate allocation to Coughlin of more than $222,000 of taxable income resulting in Coughlin being shouldered with approximately $93,000 of unwarranted liability for federal and state taxes.

62.     The net result of Crump's unauthorized and deceptive acts resulted in Coughlin incurring a substantial and disproportionate share of Access Partners' tax liabilities.

### *Crump Attempted to Force Coughlin into a Fire Sale of His Interest in the Company*

63.    After that, Crump implemented a misguided plan to appropriate Access Partners' entire business for his own selfish benefit.  First, he attempted to buy Coughlin's stake in the Company at a discount to its fair value.

64.    On or about August 23, 2021, Crump sent Coughlin a written offer to purchase Coughlin's 65% stake in the Company.  This lowball offer was comprised of (i) $50,000 in cash; and (ii) a contingent future note payment of approximately $57,000 if Access retained AT&T as a client for at least three years.

65.    Crump demanded a response by September 13, 2021.  Coughlin refused to give up his ownership stake in the Company at such a steep and unjustified discount.

66.    On November 18, 2021, Crump sent Coughlin a revised written offer to purchase Coughlin's stake in Access Partners.  This time, Crump increased his offer to just over $145,000.  Still, this offer was contingent on Crump executing a new agreement with Access Partners' biggest client, AT&T, to remain in place as a client for a minimum of three years.

67.    All of Crump's written communications concerning is attempted purchase of Access Partners were directed to Coughlin in Massachusetts.

68.    No later than September 2021, it became clear that Crump no longer desired to operate Access Partners with Coughlin.  As a result, Coughlin began to make arrangements to ensure that the Company would continue to function if Crump was no longer at the helm.

### *Crump Resigned, Admittedly Solicited Access Partners' Largest Client, and Attempted to Force Dissolution*

69.    Faced with the reality of rebalancing the past distributions and tax liabilities shouldered by Coughlin, and unable to induce Coughlin to give up his ownership stake voluntarily,

the next step in Crump's plan was to resign his position as Member-Manager, with the intention of destroying the Company via forced dissolution.

70.     On September 20, 2021, Crump wrote to Coughlin, submitting his resignation as a Member-Manager of Access Partners, effective as of September 30, 2021, and citing Article XIV, Section 1.6 of the Operating Agreement.  At that time, Crump took the (mistaken) position that his resignation as a Member-Manager required the dissolution of Access Partners as a result.  A copy of Crump's September 20, 2021 letter is attached as **<u>Exhibit A</u>**.

71.     As defined in the Operating Agreement, "Resignation" is the act of a Member-Manager voluntarily ceasing to be a Member-Manager, but continuing to be a Member. Additionally, the Operating Agreement's provisions governing dissolution state that the resignation of a ***Member,*** with the result that only one Member would remain on the effective date of the resignation, requires the Company to dissolve (unless a Substitute Member is elected or appointed prior to such effective date, which, in fact, occurred).  Critically, a Member's mere resignation as a ***Member-Manager*** does not require the Company to dissolve.

72.     In his September 20, 2021 letter, Crump laid bare his plan to steal away Access Partners' business.  He explained that he would notify Access Partners' largest client, AT&T, of a "change in management" and seek to extend AT&T's agreement with Access Partners until December 31, 2021.  Crump's plan was to demand compensation in the amount of $15,000 per month (plus other benefits) from Access Partners to provide services to AT&T.

73.     Crump also advised Coughlin that he would "be securing [his] own supplier agreement ***on or before September 30, 2021***" with AT&T.  (Ex. B at 1) (emphasis added.)

74.    In other words, Crump admitted to Coughlin, in writing, that he planned to solicit business from AT&T in the form of a supplier agreement even *before* his resignation as a Member-Manager of Access Partners became effective.

75.    Upon information and belief, Crump did in fact solicit business from AT&T both before and after his resignation as a Member-Manager of Access Partners, and used confidential and proprietary information of Access Partners in those solicitations.

76.    Given these threats, and to leave no room for doubt that Access Partners would continue as a going concern after Crump's resignation from his role as a Member-Manager, Coughlin assigned a portion of his 65% membership interest to a separate entity, which became a Substitute Member in accordance with the Operating Agreement.  Accordingly, at all relevant times, Access Partners had at least two Members.

77.    Crump's scheme to force the dissolution of Access Partners was not as effective as he had expected.  In various letters to Coughlin, Crump purported to "extend" his resignation at various intervals, until he ultimately resigned as a Member-Manager, effective December 31, 2021.  The purpose of this was not to benefit Access Partners in any way—it was an attempt to hold leverage over Coughlin to force a sale of Coughlin's stake at a discount.

78.    Even after disclosing his intention to solicit AT&T in a new venture, Crump described the purported extensions of his resignation as "an effort to maintain [his] fiduciary responsibilities" pursuant to Access Partners' Operating Agreement.

79.    On December 7, 2021, Crump's Massachusetts counsel wrote to counsel for Coughlin, confirming that Crump intended to formally resign as a "Member-Manager of the LLC meaning his status would be remain [*sic*] as a member of the LLC" and asserting that the reason

Crump purported to extend his resignation was "in honor of his fiduciary responsibilities to the Company."

80.     Far from honoring his fiduciary obligations, the entire purpose of Crump's resignation plan was to force the dissolution of Access Partners, as he (wrongly) thought that the dissolution of the Company would free him to compete on his own—without Coughlin as his business partner.

81.     However, Crump's ill-advised dissolution plan failed, since the mere resignation of a Member-Manager was not sufficient to trigger dissolution, and even if it were (which it is not), a Substitute Member was assigned a membership interest before the effective date of Crump's resignation as a Member-Manager.

82.     Because the attempt to force the Company's dissolution failed, Crump took the next step in his scheme:  stealing the entirety of Access Partners' business out from under the Company and forming a new (nearly identical) business operation, without Coughlin.

### *Crump Stole Access Partners' Assets and Began a New, Competing Venture*

83.     Either before or immediately after Crump resigned from Access Partners, Crump began operating a new venture.  The new venture, which conducts business under the name(s) Hybri-Tel and/or Tri-C, is essentially a carbon copy of Access Partners.  The only significant difference is that Coughlin is not a member of the new venture.

84.     Upon information and belief, in order to embark on this new venture, Crump stole essentially all of Access Partners' clients, prospect lists, customer lists, agreements, and other confidential business information.  As the primary operator of Access Partners, Crump was uniquely positioned to do this.

85.    Crump knew that the knowledge, relationships, and expertise of Access Partners' employee, vendors, and contractors would be essential to the success of his new enterprise.

86.    Upon information and belief, Crump solicited Access Partners' key employee, as well as other essential personnel and various subcontractors and/or vendors of Access Partners. Crump worked with these personnel at Access Partners, and now these personnel are working with or on behalf of Crump's new venture.

87.    Apparently, Crump led these key personnel to believe that leaving Access Partners and joining his new competing venture would simply be "business as usual."

88.    Since then, Crump started operating his new venture—under the name Hybri-Tel and/or Tri-C Endeavors—by hiring away Access Partners' employee and contractors, using Access Partners' information and documents, and soliciting and servicing Access Partners' clients.

89.    Upon information and belief, with respect to certain work orders (also known as Project Information Forms, or PIFs) from AT&T, which had originally been assigned to Access Partners, Crump caused those work orders to be re-assigned to his new venture.  Now, either Hybri-Tel or Tri-C is performing work for AT&T based on PIFs originally directed to Access Partners.

90.    Upon information and belief, Crump has misappropriated and retained Access Partners' emails and documents, business leads, contracts, and financial information.

91.    Upon information and belief, Crump's new venture has conducted or solicited business in various jurisdictions, including Massachusetts.

### *Defendants' Willful Infringement of Access Partners' Registered Trademark*

92.    To jumpstart his new venture, Crump misappropriated the Access Partners brand by willfully infringing on Access Partners' federally registered trademark.

93.    Access Partners owns an incontestable federal trademark registration issued by the United States Patent and Trademark Office for its "Tech.Know.Logical" Mark pursuant to

Registration No. 3,868,673 (the "'673 Registration" or the "Tech.Know.Logical Mark").  A copy

of the registration from the United States Patent and Trademark Office is attached as **Exhibit B**.

94.    In addition to the '673 Registration, Access Partners also has common law rights

in its Tech.Know.Logical Mark.

95.    Access Partners has invested substantial time and resources in building its goodwill

in the Tech.Know.Logical Mark, and in protecting its valuable brand.

96.    Access Partners uses the Tech.Know.Logical Mark to identify its services in the

marketplace.  For example, the following image appears on Access Partners' website, describing

the Company's services (http://www.access-partners.net/home.html):

**access-partners**

Established in 1997, Access Partners is a full-service, consulting and advisory platform to both the
telecommunications and real estate sectors. Our success can be attributed to our relentless desire to meet and
exceed our customers' needs and expectations by continuously raising the bar. We are constantly evolving to meet
ever-changing paradigm shifts through cost-effective, creative solutions that deliver timely, measureable results.

tech.know.logical®

97.    Crump was involved in obtaining trademark protection for Access Partners'

Tech.Know.Logical Mark.  Crump has actual knowledge that the Mark is protected.

98.    Without authorization, Crump has misappropriated the Tech.Know.Logical Mark

for the benefit of his new venture, by using the "Infringing Mark" reproduced below.



99.     Through Hybri-Tel, Crump has used the Infringing Mark, with the same punctuation and lower case capitalization, while in the form of a trademark, for the benefit of his new competing venture.

100.    Hybri-Tel is not associated with Access Partners.

101.    Crump and Hybri-Tel are not authorized, and have never been authorized, to use the Infringing Mark.

102.    Upon information and belief, Crump has actual knowledge that the Infringing Mark violates the protected trademark rights of Access Partners' Tech.Know.Logical Mark.

103.    Hybri-Tel's use of the Infringing Mark is likely to confuse, mislead, or deceive consumers into believing that Hybri-Tel's brand and services originate from, or are associated with, Access Partners' brand and services, when in fact, they are not.

104.    The goodwill that Access Partners has developed in its Tech.Know.Logical Mark has been put at risk by Hybri-Tel's appropriation and use of the Infringing Mark.

105.    Access Partners has no adequate remedy at law to forestall Hybri-Tel's infringement and Access Partners has been and will continue to be irreparable injured and harmed by Hybri-Tel's past and ongoing unlawful conduct.

### *Crump has Refused to Cease his Unlawful Activity*

106.    On January 13, 2022, counsel for Coughlin wrote to Crump's Massachusetts counsel to explain the serious legal exposure arising from Crump's conduct, and to demand that Crump cease his wrongful conduct immediately, stop competing against Access Partners, resume Access Partners' ordinary operations, hold in constructive trust any assets of Crump's new venture, and provide an accounting of Access Partners' financial records.

107.    In almost every respect, Crump ignored this demand.

108.   Instead, five days later, Crump's Massachusetts counsel wrote to the financial institution where Access Partners maintains its bank accounts.

109.   Access Partners' bank accounts are maintained in Massachusetts.

110.   In that correspondence, Crump's counsel once again confirmed that Crump had resigned from his position as a Member-Manager, while continuing to be a Member of Access Partners.

111.   Crump's counsel further requested that the financial institution place a "FREEZE" on the accounts held by Access Partners in Massachusetts.

112.   In response, the financial institution placed a temporary hold on accounts held by Access Partners.

113.   As a result of Crump's interference, Coughlin and Access Partners have been harmed, and the Company's business operations have been stalled.  Without the ability to access Company funds, Coughlin has been forced to underwrite Access Partners' business expenses from his own personal account.

## COUNT I
### Violation of Lanham Act/Trademark Infringement, 15 U.S.C. § 1114
### (*Access Partners v. Crump, Hybri-Tel, and Tri-C*)

114.   Plaintiff repeats and incorporates by reference the allegations contained in all preceding paragraphs as if set forth fully herein.

115.   Access Partners is the owner of the incontestable '673 Registration for its Tech.Know.Logical trademark.

116.   Access Partners uses its Tech.Know.Logical Mark in the provision of its products and services to clients.

117.   The Tech.Know.Logical Mark is incontestable, distinctive, and entitled to trademark protection.

118.    Defendants have continuously used the Infringing Mark in commerce, since its date of first use, in connection with the sale, offering for sale, distribution, and advertising of Defendants' services.

119.    Defendants' actions are likely to cause confusion, mistake, and deception as to the origin, sponsorship, or approval of the Defendants' products or commercial activities, and thus constitute infringement of the registered Tech.Know.Logical Mark in violation of Section 32 of the Lanham Act, 15 U.S.C. § 1114.

120.    Defendants had actual knowledge of the registered Tech.Know.Logical Mark since at least January 25, 2010, the date the Mark's registration was filed, because Defendant Crump, as a Member-Manager of Telco Access, participated in obtaining trademark protection for the Mark. Moreover, all Defendants knew or should have known about the registered Tech.Know.Logical Mark because even a cursory search of U.S. trademark filings would have shown that Telco Access Partners has rights to the Mark.

121.    Nevertheless, Defendants have persisted in their infringing conduct, rendering such conduct knowing and willful.

122.    As a direct and proximate result of Defendants' willful actions, conduct, and practices, Access Partners has been damaged and will continue to suffer irreparable harm.

## COUNT II
### Breach of Contract
### (*Coughlin and Access Partners v. Crump*)

123.    Plaintiffs repeat and incorporate the allegations contained in all preceding paragraphs as if set forth fully herein.

124.    The Operating Agreement is a valid and binding contract supported by adequate consideration.

125.     The Operating Agreement provides that a Member-Manager may be held liable under the Operating Agreement to the Company or its Members if the Member-Manager was not acting in good faith and in a manner reasonably believed to be duly authorized in accordance with the Operating Agreement, or was opposed to the best interests of the Company.

126.     The Operating Agreement prohibits Member-Managers from engaging in intentional misconduct, fraudulent conduct, embezzlement, or a knowing violation of law.

127.     The Operating Agreement provides that Crump will abide by the confidentiality, non-solicitation, and non-competition terms set forth in the Operating Agreement.

128.     Additionally, the Operating Agreement provides that each Member shall indemnify the Company for any costs or damages incurred by the Company as a result of the unauthorized action of such Member.

129.     Coughlin has performed his obligations under the Operating Agreement.

130.     Crump has materially breached, and is in material breach of, his obligations under the Operating Agreement by:

  a.   intentionally issuing unauthorized and unequal distributions and misallocating taxable income for Crump's own benefit, at Coughlin's expense;

  b.   soliciting current and prospective clients of Access Partners, including AT&T;

  c.   soliciting Access Partners' key employee, as well as other essential personnel and various subcontractors and/or vendors of Access Partners;

  d.   competing against Access Partners by operating a new venture, under the business name Hybri-Tel and/or Tri-C, as early as September 2021;

  e.   converting contracts or prospective business opportunities of Access Partners to Crump's new venture;

  f.   misappropriating or retaining confidential and proprietary information of Access Partners, and using such information to compete against Access Partners, including but not limited to Access Partners' financial records, contracts, client lists, company leads, margin information, and other resources; and

g. interfering with Access Partners' operations by causing a temporary freeze to be placed on Access Partners' bank accounts.

131. Crump's actions were not undertaken in good faith, were not duly authorized in accordance with the Operating Agreement, and/or were opposed to the best interests of Access Partners.

132. Crump's actions have caused loss or damage resulting from Crump's intentional misconduct and knowing violation of law.

133. As a direct and proximate result of Crump's material breaches of the Operating Agreement, Coughlin and Access Partners have suffered damages in an amount to be proven at trial.

## <u>COUNT III</u>
### Breach of the Implied Covenant of Good Faith and Fair Dealing
### (*Coughlin and Access Partners v. Crump*)

134. Plaintiffs repeat and incorporate the allegations contained in all preceding paragraphs as if set forth fully herein.

135. Every contract, including the Operating Agreement, contains an implied covenant of good faith and fair dealing.

136. Crump breached the covenant of good faith and fair dealing by, among other things:

a. intentionally issuing unauthorized and unequal distributions and misallocating taxable income for his own benefit, at Coughlin's expense;

b. soliciting current and prospective clients of Access Partners, including AT&T;

c. soliciting Access Partners' key employee, as well as other essential personnel and various subcontractors and/or vendors of Access Partners;

d. competing against Access Partners by operating a new venture, under the business name Hybri-Tel and/or Tri-C, as early as September 2021;

e. converting contracts or prospective business opportunities of Access Partners to Crump's new venture;

    f.   misappropriating or retaining confidential and proprietary information of Access Partners, and using such information to compete against Access Partners, including but not limited to Access Partners' financial records, contracts, client lists, company leads, margin information, and other resources; and

    g.   interfering with Access Partners operations by causing a temporary freeze to be placed on Access Partners' bank accounts.

137.    As a result of Crump's breaches of the covenant of good faith and fair dealing, Coughlin and Access Partners suffered, and continue to suffer, damages including but not limited to: lost customer opportunities, loss of value, loss of income, the value of foregone opportunities, and substantial out of pocket and consequential damages flowing from the above, including ongoing attorneys' fees, costs, and expenses.

**<u>COUNT IV</u>**
**Breach of Fiduciary Duty**
**(*Coughlin and Access Partners v. Crump*)**

138.    Plaintiffs repeat and incorporate the allegations contained in all preceding paragraphs as if set forth fully herein.

139.    Access Partners is a closely held business entity as defined by Massachusetts law.

140.    Access Partners has two Members. There is no ready market for Access Partners ownership interests, and there is substantial ownership participation in Company management.

141.    As a 35% owner of Access Partners, Crump owes Coughlin and Access Partners the fiduciary duties of the utmost good faith and loyalty.

142.    Crump breached his fiduciary duties in numerous ways, including:

    a.   intentionally and unlawfully misallocating distributions and taxable income, to enrich himself at Coughlin's expense;

    b.   attempting to force dissolution of Access Partners by resigning as a Member-Manager, in violation of the Operating Agreement and in opposition to the best interests of Access Partners;

    c.   advancing his selfish interests in starting a competing venture, rather than devoting his time to managing and growing Access Partners;

d.   stealing Access Partners' clients;

e.   soliciting away Access Partners' employee, contractors, and vendors; and

f.   usurping substantially all of Access Partners' information, documents, contracts, client lists, business leads, and other resources and diverting that information away from Access Partners for the benefit of Crump's new competing venture.

143.   As a proximate result of Crump's breaches of his fiduciary obligations, Coughlin and Access Partners have suffered and will continue to suffer damages.

144.   Crump's actions were not undertaken in good faith, were not duly authorized in accordance with the Operating Agreement, and were opposed to the best interests of Access Partners.

145.   Crump's actions have caused loss or damage resulting from Crump's intentional misconduct and knowing violation of law.

146.   Because Crump's actions were undertaken willfully and maliciously, or in the alternative, recklessly without regard for the damages he would cause, Coughlin and Access Partners are further entitled to an award of punitive damages.

<u>**COUNT V**</u>
**Violation of M.G.L. c. 93A, § 11**
(*Access Partners v. Crump, Hybri-Tel, and Tri-C*)

147.   Plaintiff Access Partners repeats and incorporates the allegations contained in all preceding paragraphs as if set forth fully herein.

148.   Access Partners is a "person" engaged in trade or commerce in the Commonwealth of Massachusetts within the meaning of M.G.L. c. 93A, § 1.

149.   Crump, Hybri-Tel, and Tri-C are each a "person" engaged in trade or commerce in the Commonwealth of Massachusetts within the meaning of M.G.L. c. 93A, § 1.

150.     Crump's conduct took place outside the scope of his duties as a Member and Member-Manager of Access Partners, and his conduct on behalf of his new venture, including the conduct of Hybri-Tel and Tri-C, constitute unfair and/or deceptive acts or practices.

151.     Crump misappropriated, removed, or retained proprietary and confidential information of Access Partners, without authority and in violation of the Operating Agreement, and with the intent to disclose or use that information for the benefit of his new venture, Hybri-Tel and/or Tri-C.

152.     Crump, Hybri-Tel, and/or Tri-C used or retained proprietary and confidential information of Access Partners in the marketplace, without authority, for the benefit of Hybri-Tel and/or Tri-C.

153.     Crump, Hybri-Tel, and/or Tri-C willfully infringed on Access Partners' federal and common law rights in its registered Tech.Know.Logical Mark by using the Infringing Mark, which caused confusion among consumers and damage to Access Partners' business and brand.

154.     Crump, Hybri-Tel, and Tri-C's conduct occurred primarily or substantially in Massachusetts and Access Partners has suffered harm in Massachusetts.

155.     Crump, Hybri-Tel, and Tri-C's conduct constitutes a willful and/or knowing violation of M.G.L. c. 93A, § 11.

156.     As a result of the conduct of Crump, Hybri-Tel, and Tri-C, Access Partners has suffered and will continue to suffer substantial damages.

### COUNT VI
**Conversion**
***(Access Partners v. Crump, Hybri-Tel, and Tri-C)***

157.     Plaintiffs repeat and incorporate the allegations contained in all preceding paragraphs as if set forth fully herein.

158.    Access Partners exercised ownership, control, or dominion over its assets, confidential and proprietary business information, and other resources.

159.    Crump intentionally converted and misappropriated assets of Access Partners by issuing unauthorized distributions in favor of Crump and at the expense of Coughlin.

160.    Crump, Hybri-Tel, and Tri-C intentionally converted and misappropriated Access Partners' assets and wrongfully exercised ownership, control, or dominion over Access Partners' confidential and proprietary business information and materials in connection with Crump's new venture.

161.    As a result of such conversion, Coughlin and Access Partners have suffered and continue to suffer damages including, but not limited to, lost customer opportunities, loss of value, loss of income, the value of foregone opportunities, and substantial out of pocket and consequential damages flowing from the above, including ongoing attorneys' fees, costs, and expenses.

<u>COUNT VII</u>
**Tortious Interference**
**(*Access Partners v. Crump, Hybri-Tel, and Tri-C*)**

162.    Plaintiff Access Partners repeats and incorporates the allegations contained in all preceding paragraphs as if set forth fully herein.

163.    Crump is a member of Hybri-Tel and Tri-C.

164.    Access Partners had binding contracts and agreements with several clients, including AT&T.

165.    Access Partners also had prospective business relationships with several clients, including AT&T, with the probability of future economic benefit from those relationships.

166.    Crump, Hybri-Tel and Tri-C had knowledge of Access Partners' contracts and prospective business relationships with its clients, including AT&T.

167.    Crump, Hybri-Tel, and Tri-C knowingly and intentionally interfered with or induced or persuaded AT&T and other clients of Access Partners not to perform their respective obligations under their contract(s), with improper motive and means.

168.    Crump, Hybri-Tel, and Tri-C knowingly and intentionally interfered with or induced or persuaded AT&T and other prospective clients not to enter into or continue the prospective business relationship with Access Partners, with improper motive and means.

169.    Crump undertook such actions with actual malice and with a spiteful and malignant purpose to harm Access Partners and Coughlin, unrelated to any legitimate business interest.

170.    As a result of Crump, Hybri-Tel and Tri-C's actions, Access Partners has suffered damages and continues to suffer damages.

## COUNT VIII
### Unjust Enrichment
### (*Access Partners v. Crump, Hybri-Tel, and Tri-C*)

171.    Plaintiff Access Partners repeats and incorporates the allegations contained in all preceding paragraphs as if set forth fully herein.

172.    By their conduct, Crump and his new venture, operating through Hybri-Tel and/or Tri-C, have been unjustly enriched through the benefits conferred upon it by Access Partners' proprietary and confidential information, which Mr. Crump wrongfully took and retained for the advantage of his new venture, without authorization from Access Partners, and to the detriment of Access Partners.

173.    Crump, Hybri-Tel and Tri-C knowingly benefitted from the improper use of Access Partners' confidential and proprietary information.

174.    Crump, Hybri-Tel and Tri-C knowingly benefitted from the misappropriation of Access Partners' confidential and proprietary information.

175.    Hybri-Tel, and Tri-C knowingly accepted and/or retained the benefits of information and resources that belonged to Access Partners, which were improperly acquired or retained by Crump, in such circumstances that make such acceptance or retention inequitable without payment to Access Partners for value.

176.    As a direct and proximate cause of Crump, Hybri-Tel and Tri-C's unjust enrichment, Access Partners has suffered and continues to suffer damages.

177.    Access Partners is entitled to restitution and/or disgorgement of profits that Hybri-Tel and/or Tri-C derived from the benefits improperly conferred upon them to Access Partners' detriment.

178.    As a result of Crump, Hybri-Tel and Tri-C's actions, Access Partners has suffered damages and continues to suffer damages.

### COUNT IX
**Declaratory Judgment – Tax Incidents**
**(*Coughlin v. Crump*)**

179.    Plaintiff Coughlin repeats and incorporates the allegations contained in all preceding paragraphs as if set forth fully herein.

180.    There is an actual controversy between Coughlin and Crump as to the allocation of the taxable income of the Company between its Members.

181.    This controversy has resulted in Coughlin incurring substantial and unnecessary additional tax liabilities.

182.    Coughlin seeks a declaration that Crump's allocation of unwarranted taxable income upon Coughlin breached Crump's obligations as "Tax Matters Partner" under Article X of the Operating Agreement.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

A.      Award judgment in favor of Plaintiffs and against Defendants, jointly and severally, on each and every Count;

B.      Award Plaintiffs preliminary and permanent injunctive and equitable relief, as is just and proper, including, but not limited to, a temporary restraining order and/or injunction preventing Defendants from using the Infringing Mark, engaging in any further unfair or deceptive practices, from competing against Access Partners, and from soliciting the employee, clients, contractors, and vendors of Access Partners;

C.      Award Plaintiffs all of Defendants profits arising from the foregoing acts;

D.      Award Plaintiffs compensatory damages in an amount to be determined at trial;

E.      Award Plaintiffs an Order requiring Defendants to pay corrective advertising for the foregoing acts, in an amount to be determined at trial;

F.      Award Plaintiffs doubling or trebling of compensatory damages, based on 15 U.S.C. § 1117 and also based on Defendants' willful and knowing violations of Massachusetts law;

G.      Award Plaintiff statutory damages as allowed by law;

H.      Award Plaintiffs attorney's fees and costs;

I.      Award prejudgment interest at the maximum legal rate;

J.      Award indemnification of Access Partners by Crump; and

K.      Award Plaintiffs any other such and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs James C. Coughlin and Telco Access Partners, LLC request a trial by jury on every claim so triable.

Respectfully submitted,

**James C. Coughlin and
Telco Access Partners, LLC**

By their attorneys,


/s/ Scott C. Ford
Scott C. Ford (BBO # 629280)
SCFord@mintz.com
Grady R. Campion (BBO # 704748)
GRCampion@mintz.com
MINTZ, LEVIN, COHN, FERRIS, GLOVSKY
  AND POPEO, P.C.
One Financial Center
Boston, MA  02111
Tel.:  (617) 542-6000
Fax:  (617) 542-2241


Dated:  April 20, 2022

123246773